Carlton V. WRIGHT, Appellant,

v.

UNITED STATES, Appellee.

Leroy CARLTON, Jr., a/k/a William M.
Carlton, Appellant,

v.

UNITED STATES, Appellee.

Nos. 10930, 10973 and 11813.

District of Columbia Court of Appeals.

Argued Jan. 4, 1978.

Decided May 15, 1978.

Silas S. Wasserstrom, Public Defender Service, Washington, D. C., with whom Karen E. Moore and Robert F. Muse, Public Defender Service, Washington, D. C., were on brief, for appellant in No. 10930.

Herbert N. Beller, Washington, D. C., appointed by the court, for appellant in Nos. 10973 and 11813.

Steven D. Gordon, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before HARRIS, MACK, and FERREN, Associate Judges.

FERREN, Associate Judge:

Appellants Carlton Wright and Leroy Carlton have each been convicted of one count of armed robbery (D.C. Code 1973, §§ 22–2901, –3202), and three counts of assault with a dangerous weapon (D.C. Code 1973, § 22–502). They base their appeals, however, on separate grounds. Mr. Wright asserts that the prosecutor's attack on his alibi defense during closing argument to the jury included an impermissible reference to the fact that he had not taken the stand in his own defense, in violation of his Fifth Amendment rights. Mr. Carlton challenges the denial of two alternative motions for new trial—one brought pursuant to D.C. Code 1973, § 23–110 (motion attacking sentence) alleging ineffective assistance of counsel, in violation of his Sixth Amendment rights, and the other pursuant to Super. Ct. Cr. R. 33 claiming newly discovered evidence. Finding no error, we affirm appellants' convictions.

## I.

The robbery took place at the Astar Men's Shop over a period of two to three hours during the late morning and early afternoon of September 9, 1975. The government's evidence showed that the perpetrators first entered the store at about noon but left without making a purchase. When they returned 45 minutes to an hour later, one of the men, later identified as appellant Wright, displayed a sawed-off shotgun. Samuel Goldsmith, a salesman, and William Willis, the store manager, were forced to lie on the floor while their hands and feet were tied behind them. Store employees Carey Brock and Deirdre Fairley were also tied up after they returned to the store. The four captives were placed in a dressing room. While the robbers busied themselves loading merchandise into Mr. Willis's car, which was parked in front of the store, they made periodic checks on the captives. At approximately 1:47 p. m., a uniformed police officer, Leo Wilson, entered the store. (The open trunk of Mr. Willis's car had attracted his attention.) The robbers forced Officer Wilson to lie on the floor. After they had bound his hands and feet, they moved him with the other four captives to a bathroom at the rear of the store. Sometime between 2:00 and 3:00 p. m., a pair of plainclothes policemen visited the store; they had stopped by to pay a social call on Ms. Fairley. When told by the perpetrators that the shop was closed for inventory, the officers left, unaware that they had walked in on a robbery in progress. By the time that the five captives had freed themselves, the robbers had made their getaway in Mr. Willis's car.

Appellant Carlton became a focus of the subsequent investigation when the police found Mr. Willis's car near the home of Mr. Carlton's brother and father. After Ms. Fairley, working with a police artist, had developed a composite drawing (which bore a resemblance to Mr. Carlton), the police showed her a photo array which included Mr. Carlton's picture. She identified him. Later, from a 36-photo array which included Mr. Carlton and his known associates, Messrs. Willis and Goldsmith identified appellant Wright but made no identification of Mr. Carlton. Still later, Mr. Goldsmith and one of the plainclothes officers were able to pick out Mr. Wright from a police lineup; Officer Wilson made a lineup identification of Mr. Carlton. In-court identifications corresponding to the lineup identifications were made at trial.

Appellant Wright presented an alibi defense through the testimony of the manager of O'Donnell's Sea Grill, where Mr. Wright was employed as one of two dishwashers. Mr. Wright's time card showed that he had punched in at approximately 9:00 a. m., and punched out about 5:00 p. m. The manager's testimony confirmed Mr. Wright's presence at the restaurant at approximately those two times. Mr. Wright also called to the stand two police officers: a Mobile Crime Laboratory technician, who testified that none of the identifiable fingerprints from the store or from Mr. Willis's car matched those of either defendant; and the second plainclothes officer, who was unable to make any identification.

Appellant Carlton's counsel obtained a pretrial ruling which barred the prosecution from bringing out (1) his client's criminal record and (2) the fact that at the time of the robbery, Mr. Carlton was residing in the same halfway house where his codefendant, Mr. Wright, lived. Mr. Carlton limited his defense at trial to cross-examination of government witnesses.

## II.

Appellant Wright contends that the prosecutor improperly attempted to attack his alibi defense by pointing out to the jury that there was no testimony placing him at the restaurant during the hours when the robbery was taking place. He argues that his prosecutorial tactic constituted an implicit comment on his failure to testify at trial, in violation of his Fifth Amendment right to remain silent.

■ In making this argument, appellant Wright has not maintained that his Fifth Amendment rights could bar the government from introducing evidence which only the defendant could successfully contradict. Accordingly, "[i]f the state is free to do this, it must also be free to engage in normal advocacy so long as it does not point a finger at the accused's remaining silent in the courtroom." *United States ex rel. Leak v. Follette,* 418 F.2d 1266, 1268 (2d Cir. 1969), *cert. denied,* 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970). More particularly, as stated in *Peoples v. United States,* D.C.App., 329 A.2d 446 (1974), the test for whether a prosecutor's remarks crossed the boundary of permissible advocacy, infringing upon a defendant's Fifth Amendment rights, is whether the prosecutor's statements " 'manifestly *intended* or [were] of *such character* that the jury would naturally and necessarily take [them] to be a comment on the failure of the accused to testify.' " *Id.* at 450 (quoting *Doty v. United States,* 416 F.2d 887, 890 (10th Cir. 1969) (emphasis added). *Accord, Brown v. United States,* D.C.App., 383 A.2d 1082 (1978); *Byrd v. United States,* D.C.App., 364 A.2d 1215, 1218 (1976); *Blango v. United States,* D.C.App., 335 A.2d 230, 232 (1975).

We find no direct or circumstantial evidence of a conscious design—an intent—on the part of the government to deprive appellant Wright of a fair trial by words or acts which the prosecutor knew or should have known to be impermissible. *Cf. Villacres v. United States,* D.C.App., 357 A.2d 423 (1976) (erroneous description of evidence and reference to suppressed evidence); *United States v. Hawkins,* 156 U.S. App.D.C. 259, 480 F.2d 1151 (1973) (repetition of inflammatory comments in the face of warnings from the bench); *United States v. Phillips,* 155 U.S.App.D.C. 93, 476 F.2d 538 (1973) (prosecutor's use of inflammatory comments in rebuttal and closing argument); *Jones v. United States,* 119 U.S.App.D.C. 213, 338 F.2d 553 (1964) (prosecutor's erroneous description of government's evidence). Thus, we are left to apply the second, objective standard in the test.

■ By way of background, it is important to note a well-established principle: "The rule that the prosecution shall not comment on the failure of the accused to testify should not prevent an argument that the evidence of the government is uncontradicted or unexplained." *Carlisle v. United States,* 194 F. 827, 830 (4th Cir. 1912). *Accord, Lefkowitz v. United States,* 273 F. 664 (2d Cir.), *cert. denied,* 257 U.S. 637, 42 S.Ct. 49, 66 L.Ed. 409 (1921). When this principle is coupled with our test in *Peoples, supra* (and the subsequent cases cited), it follows—and this is the critical point—that for Fifth Amendment purposes a prosecutor's argument to the jury that the defense failed to contradict government evidence is forbidden only in cases where the defendant alone could possibly have contradicted the government's testimony. *See, e. g., Ruiz v. United States,* 365 F.2d 103, 105 (10th Cir. 1966); *Garcia v. United States,* 315 F.2d 133, 137 (5th Cir.), *cert. denied,* 375 U.S. 855, 84 S.Ct. 117, 11 L.Ed.2d 82 (1963); *Leathers v. United States,* 250 F.2d 159, 165–166 (9th Cir. 1957); *Hunt v. United States,* 231 F.2d 784, 785 (8th Cir. 1956); *Langford v. United States,* 178 F.2d 48, 55 (9th Cir. 1949). This,

of course, requires a case-by-case evaluation.

In *White v. United States,* D.C.App., 248 A.2d 825 (1969), for example, we found it reversible error for the prosecutor to point out that the testimony of two police officers with whom the defendant had been involved in an altercation was uncontradicted, for all the evidence indicated that only the defendant and the two officers had been present when the incident occurred. In *Manago v. United States,* D.C.App., 331 A.2d 335, 337 (1975), however, we held that a prosecutor's comment that "[a]ll of the evidence came from the government" did not amount to plain error. It was only a passing reference; moreover, defense counsel himself, prior to the prosecutor's rebuttal, had commented on his client's decision not to take the stand. Similarly, in *Blango v. United States, supra,* we held that the prosecutor's comment that the government's witness had "the guts to get on the stand" was not an impermissible comment on the failure of the defendants to testify, where defendants had called into question the credibility of the government's witness by demonstrating inconsistencies with his earlier grand jury testimony.

■ In the present case, appellant Wright presented his alibi defense through the testimony of Mr. Rasheghi, the manager of O'Donnell's. Appellant plainly wanted the jury to believe that this testimony put him somewhere other than at the scene of the crime at the time it was taking place. In the prosecutor's closing argument challenged here, he attempted to convince the jury that the testimony of Mr. Raseghi and Ms. Hamilton (appellant's dishroom coworker, who had been called by the government as a rebuttal witness) had not accomplished this goal. Given these two witnesses from O'Donnell's, the jury had no reason to believe that Mr. Wright alone was in a position to verify his presence at the restaurant during the critical time period. Accordingly, the jurors were not necessarily driven toward the conclusion that only appellant Wright could possibly have been in a position to add further testimony in support of the alibi. *See United States ex rel. Leak v. Follette, supra.* We conclude that the prosecutor's statement here was not " 'of such character that the jury would naturally and necessarily take [it] to be a comment on the failure of the accused to testify.' " *Peoples v. United States, supra* at 450.

### III.

Appellant Carlton claims that ineffectiveness of counsel deprived him of an alibi defense, in violation of his Sixth Amendment rights. It is clear that appellant's counsel was aware of the possibility of such a defense before trial commenced. An employee of the halfway house had told Mr. Carlton that the house records showed the specific times he had entered and left the facility on the day of the robbery. After learning this from appellant, trial counsel inspected copies of these records in the hands of the police. According to his testimony at the hearing on the motion for a new trial, however, trial counsel had considered these records "shaky" evidence because they indicated that appellant had been outside the halfway house during a portion of the time when the robbery was taking place. Rather than introduce the records and allow the jury to become aware that appellant Carlton had a prior criminal record and was living at the very halfway house where codefendant Wright resided, counsel concluded that it would be wiser to base Mr. Carlton's defense solely on a claim of mistaken identity, supported by the fact that only two of the seven police officers and store employees who were present during the robbery had been able to identify him as one of the perpetrators. (Counsel had apparently based his decision in part on his belief that halfway house records were commonly known to be unreliable.)

Appellant Carlton now argues that if trial counsel had properly investigated, rather than rely only on the halfway house records held by the police, he would have learned about two witnesses who could have corroborated the reliability of the records—the reliability of the times of appellant's sign-

ing in and out. Thus, counsel arguably would have been persuaded to utilize the alibi defense which he rejected, in part, on the assumption of unreliable records.

It is important to underscore that "the effectiveness of counsel is not measured by his success," *United States v. Hammonds,* 138 U.S.App.D.C. 166, 170, 425 F.2d 597, 601 (1970). It has been the position of this court that the effectiveness of counsel's efforts is to be judged not on the basis of hindsight but from the standpoint of the reasonableness of counsel's actions at the time they were taken. "Mere errors of judgment as disclosed by subsequent events are not sufficient to establish ineffective assistance of counsel." *Angarano v. United States,* D.C.App., 312 A.2d 295, 299 (1973), *rehearing denied,* 329 A.2d 453 (1974) (en banc). *See Woody v. United States,* 369 A.2d 592, 593–94 (1977). In *Angarano, supra,* we adopted the test in *Bruce v. United States,* 126 U.S.App.D.C. 336, 379 F.2d 113 (1967), that in order to prevail on a claim of ineffective assistance there must be a showing "both that there has been gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense either in the District Court or on appeal." *Id.* at 339–40, 379 F.2d at 116–17 (footnotes omitted). *Accord, Proctor v. United States,* D.C.App., 381 A.2d 249, 251–52 (1977); *Coleman v. United States,* D.C.App., 379 A.2d 710, 712–13 (1977); *Fernandez v. United States,* D.C. App., 375 A.2d 484, 486 (1977); *Williams v. United States,* D.C.App., 374 A.2d 885, 889 (1977); *Woody v. United States, supra* at 593–94.

Under this test, we do not find ineffective assistance of counsel here. Trial counsel testified at the hearing on appellant's motion for new trial that even with full awareness of the availability of witnesses who could validate the halfway house records, he would have concluded that the tactical disadvantages of the alibi defense outweighed its evidentiary value.[1] While such testimony could be discounted as self-serving hindsight, we cannot say from the record that it lacks credibility or force. Counsel unquestionably concluded that the danger of exposing to the jury the fact that appellants had resided together at a halfway house for criminal offenders far outweighed any advantage to be gained from the available alibi defense, especially given the weak identification evidence anticipated from government witnesses. Counsel consciously advanced his strategy by successful motions to keep appellant Carlton's criminal record and residence out of the case. Had he talked with the two witnesses now proffered by appellant and thus gained additional evidence that the halfway house records were more reliable than he otherwise believed, his decision conceivably might have been a closer one. But the additional evidence would not have gone to counsel's fundamental decision that as a tactical matter appellant Carlton's defense based solely on weak identification testimony would be preferable to a defense based on an alibi, when even reliable records, corroborated by witnesses, could not completely establish the alibi. Appellant's argument overlooks the fact that part of the time he was shown to be away from the halfway house corresponded to part of the time the robbery was taking place.[2] Ac-

1. The trial court concluded, after a hearing on appellant's motion for new trial, that this tactical decision had been made with the informed consent of appellant. Ordinarily, on the record here, we would hold that we could not dismiss this finding of the trial court as "plainly wrong or without evidence to support it." D.C. Code 1973, § 17–305. If, however, defense counsel were constitutionally required to seek out the particular witnesses at issue, such client consent would not have been truly "informed." Thus, we do not rely on this ground. We do note, though, that counsel did consult with his client before selecting the most advantageous defense and accordingly fulfilled that basic duty.

2. Appellant counsel for Mr. Carlton argues that "[a]ssuming the accuracy of the entries reflected on the records which [trial counsel] saw, it would have been very difficult, if not physically impossible, for Appellant to have participated in the robbery of the Astar Men's Store" two miles away. Counsel points out that the records show appellant signing out at 9:51 a. m., back in at 11:59 a. m., then out at 12:39 p. m., back in at 1:15 p. m., and out again

cordingly, it does not appear as a constitutional matter that "a defense of substance was excluded by gross ineptitude." *Angarano v. United States, supra* at 299.

## IV.

Appellant Carlton urges us to reexamine the *Angarano-Bruce* standard and adopt either the approach of the District of Columbia Circuit in *United States v. DeCoster,* 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973), or a similar one that sets a stricter Sixth Amendment standard for counsel than *Angarano-Bruce.*[3] As a division of this court, we are not free to do so; en banc consideration would be required. In any event, in view of the sophisticated strategy employed by defense counsel, coupled with the weakness in the proposed alibi defense itself, there would be no basis under any reasonable standard for finding constitutional ineffectiveness of counsel here.

## V.

■ Appellant Carlton contends, alternatively, that the potential testimony (which his counsel was not aware of at the time of trial) corroborating the halfway house records in support of his alibi constitutes newly discovered evidence warranting a new trial pursuant to Super. Ct. Cr. R. 33.

The standards applicable to a motion for a new trial on the basis of newly discovered evidence are well established:

To obtain a new trial because of newly discovered evidence (1) the evidence must have been discovered since the trial; (2)

the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal. [*Thompson v. United States,* 88 U.S.App.D.C. 235, 236, 188 F.2d 652, 653 (1951).]

*Accord, Quick v. United States,* D.C.App., 316 A.2d 875, 876 (1974). The government argues that appellant's motion for a new trial on grounds of newly discovered evidence must fail precisely because (as appellant himself asserts in his ineffective assistance claim) the testimony which might have corroborated the halfway house records was readily available to the defense at the time of trial—had counsel chosen diligently to pursue it. We agree. We cannot say, moreover, that availability of the proffered testimony for trial "would probably [have] produce[d] an acquittal." *Thompson v. United States, supra* at 236, 188 F.2d at 653. All of the tactical considerations which justified trial counsel's decision not to proceed with the alibi defense leave enough uncertainty to withstand appellant's motion.

*Affirmed.*

at 5:50 p. m. According to the government's evidence, two robbers entered the store at around 12:00 noon to look it over for ten minutes; they returned to commence the actual robbery between 12:45 and 1:00 p. m. Appellant's return to the halfway house at 11:59 and exit at 12:39 are consistent with the approximate times of first and second entry to the store.

Appellant must concede, therefore, that even in its best light the alibi defense would not have been airtight. Appellant's argument, as a result, is limited to the proposition—set forth in his brief—that before trial counsel properly could have abandoned the alibi defense, he should have based his tactical decision on "full

knowledge of all relevant facts and circumstances." On the basis of all the facts and circumstances now disclosed, this argument does not support a conclusion that trial counsel's decision to keep the halfway house connection away from the jury turned out to have been the result of "gross incompetence," let alone to have "blotted out the essence of a substantial defense." [*Bruce, supra,* 126 U.S. App.D.C., at 339-40, 379 F.2d at 116-17.]

3. In *DeCoster, supra,* the District of Columbia Circuit adopted the following standard:

[A] defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate. [*Id.* at 331, 487 F.2d at 1202 (footnote omitted).]